# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No: |
| v. | ) | 17-cr-0051 (PGS) |
| | ) | |
| ROBERT ARELLANO, *et al.*, | ) | **OPINION** |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

This matter comes before the Court on several in limine evidentiary motions. On September 22, 2018, the Court heard oral argument on the motions and ruled on admissibility of several items of evidence but reserved on admissibility of others. The Court now rules as follows.

## VIDEO EVIDENCE

The government seeks to admit four videos – Exhibits 22, 200, 290, 291. Exhibit 22 is an approximately one-and-one-half-minute video of two dogs fighting. A person's voice, which the Government contends is Love, can be heard in the background. The Government argues it is intrinsic and relevant because it depicts the charged conduct and at least one of the dogs is named in the indictment. The second video, Exhibit 200, depicts another dog fight of approximately one and one-half minutes. A person, whom the Government also contends is Love, can be heard shouting at the dogs while they fight. The Government conceded neither of these dogs are named in the indictment but argues this video is both intrinsic and relevant because it was seized from Love's phone and contains his voice.

The third video, Exhibit 290, depict several dogs chained to posts in a dirt yard. The cameraman, allegedly Arellano, states the dogs' names and describes their fighting abilities, prior victories and championships, how well they recover after matches, how aggressive they are, and their pedigrees. He also states that he transported one dog from Florida. The Government contends that this video depicts dogs in the bloodline of those in the indictment.

The fourth video, Exhibit 291, depicts a fight between two dogs in a ring with several spectators, a referee and dog handlers. The video bears the date "8/26/1995." Several voices in the background can be heard discussing the match, cheering, and betting. The video is approximately seven minutes long, and depicts a dog dying, while the other continues to attack. At the end, someone drags the deceased dog out of the ring by its neck. According to the Government, the video was seized from Arellano's home and was edited to depict only one fight; it was originally a two-hour long compilation of multiple fights.

Defendants object to all the videos, arguing their probative value is substantially outweighed by the risk they pose of unduly prejudicing the jury. Defendants also raised, for the first time at oral argument, a separate objection to the videos based on *Bruton v. United States*, 391 U.S. 123 (1968).

### *Evidence Rule 404(b) and 403*

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." Fed. R. Evid. 404(b)(1). Such evidence may however "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Such evidence is also admissible for other reasons, including to "furnish essential background information, to demonstrate a continuing relationship

between an unindicted co-conspirator and the defendant, and to assist the jurors in understanding [a] co-conspirator's role in [a] scheme." *United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1998); *see also United States v. Simmons* 679 F.2d 1042, 1050 (3d Cir. 1982). "[M]odern cases divide evidence of other crimes and bad acts into two categories: those 'extrinsic' to the charged offense, and those 'intrinsic' to it. Extrinsic evidence must be analyzed under Rule 404(b); intrinsic evidence need not be." *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).

Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This rule adopts a "presumption of admissibility." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002). It does not mandate exclusion "merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweighs' its probative value." *Id.* (quoting Fed. R. Evid. 304). "[W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *Id.*

The Court finds Exhibits 22, 200, and 290 need not be excluded under Rule 403. Exhibit 22 is highly probative because it is offered to show the charged conduct itself – a fight with a dog that is a subject of the indictment – and Love's voice. There is no unfair prejudice in admitting the video because of its direct relevance. The Court therefore finds that Exhibit 22 is intrinsic and that it is not subject to exclusion under Rule 403.

Exhibit 200, a similar video, does not include a dog named in the indictment and therefore does not depict the conduct charged. The video is however probative of Love's knowledge, involvement in the conspiracy, intent, preparation, and plan. This probative value is not

3

substantially outweighed by the risk that the jury will consider the evidence for an improper purpose. The Court therefore finds this evidence is extrinsic to the charged conduct but admissible under Rule 404(b) and need not be excluded under Rule 403. The Court will provide an appropriate instruction to the jury with regard to this video.

Exhibit 290, the video of dogs in a yard, does not include dogs named in the indictment and does not depict any specific conduct charged.[1] The video is however probative of Arellano's knowledge, motive, and intent, his involvement in the conspiracy, and his continuing possession of dogs in the same bloodline for fighting purposes. The Court therefore finds the video evidence is extrinsic to the crimes charged but is admissible under Rule 404(b) and not subject to exclusion under Rule 403. The Court will provide an appropriate limiting instruction to the jury.

The final video – Exhibit 291 – depicts no conduct charged in the indictment and there is no indication that any defendants were present at or involved in the dog fight depicted. It also has the capacity to inflame the jury because it is a particularly graphic video in which a dog is killed and dragged out of the fighting pit. The video is also temporally remote to the allegations, also having occurred approximately twenty years prior to the dates in the indictment. Although Arellano's possession of the video at the time of the search has some marginal probative value, it is substantially outweighed by the risk unfair prejudice, confusing the issues, and misleading the jury. The Court therefore finds Exhibit 291 inadmissible under Rule 403.

### *Bruton*-Based Objections

As to the *Bruton*-based objections raised by Defendants at oral argument, the Court finds no compelling reason to exclude the videos or redact their audio on that ground. "In *Bruton v.*

---

[1] The parties disagreed as to the age of the Exhibit 290 – a fact that is apparently unknown – but appeared to agree that the video was filmed some years prior to the conduct charged in the indictment.

4

*United States*, 391 U.S. 123 (1968), the Supreme Court held that the introduction of a non-testifying defendant's out-of-court statement, which directly implicated his co-defendant by name, violated the Confrontation Clause right of the co-defendant." *United States v. Hardwick*, 544 F.3d 565, 572 (2008). The Confrontation clause is however only violated by such a statement "to the extent that it directly inculpates a co-defendant." *United States v. Green*, 543 Fed. Appx. 266, 270 (2013).

"Because '*Bruton* is no more than a by-product of the Confrontation Clause,' it is only applicable where the Confrontation Clause applies – that is, to statements that are 'testimonial.'" *Waller v. Verano*, 562 Fed. Appx. 91, 94 (2014). "'Testimonial' statements under the Confrontation Clause are those made by 'witnesses' who 'bear testimony,' such as by making a 'formal statement to government officers,' and are not statements made casually to acquaintances." *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 51-52 (1968)). The "key" to defining a testimonial statement is "that 'nothing is an assertion unless intended to be one.'" *Green*, 543 Fed. Appx. at 270 (quoting Fed. R. Evid. 801(a), advisory committee note). "The burden is on the party claiming the intention to assert existed, and ambiguous cases should be resolved in favor of admissibility." *Id.*

*Bruton* has no applicability to the statements at issue in these videos. The statements are not formal confessions to law enforcement and do not "directly implicate [their] co-defendant[s] by name." *Hardwick*, 544 F.3d at 572. The narrator in Exhibit 290 – allegedly Arellano – never named any codefendant by name or by implication. This video was more akin to a statement casually to an acquaintance rather than a formal statement to law enforcement and was thus not testimonial. *See Waller*, 562 Fed. Appx. At 94. *Bruton* is therefore inapplicable to Exhibit 290.

The Court also finds the other two videos, which included off-hand comments by Love, do not raise *Bruton* concerns. First, they do not directly implicate other defendants. However, to the extent that the voice can be construed as saying "Arellano" at the end of Exhibit 22, which is not entirely clear, that statement is not testimonial because it was not intended as an assertion. The Court therefore finds *Bruton* does not mandate exclusion or redaction of any of the three videos (Exhibits 22, 200, and 290).

### COCONSPIRATOR STATEMENTS

On September 7, the Court held it was unnecessary to hold a hearing on the admissibility of coconspirator statements pursuant to relevant Third Circuit case law and would instead rely on a written proffer by the Government showing how it would establish the existence of a conspiracy and that the statements were made in furtherance thereof. *See* ECF 180. On September 20, counsel for Arellano orally set forth his argument that the court should find each of the statements inadmissible, contending that the Government could not show by a preponderance of the evidence that Arellano was involved in the conspiracy at the time they were made or that the statements were made in furtherance of the conspiracy. Counsel also argued that the statements which involved an unknown individual were per se inadmissible.

Under Fed. R. Evid. 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. For such a statement to be admitted, the court must find:

> (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy.

6

*United States v. Ellis*, 156 F.3d 493, 496 (3d Cir. 1998). The burden is on the proponent of this evidence to make this showing by a preponderance of the evidence. *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

"Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made." *United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011). "A statement by an unknown speaker can qualify for this exception if the government establishes the speaker was likely a member of the conspiracy alleged." *United States v. Lignelli*, 660 Fed. Appx. 118, 124 (2016).

### *Existence of the Conspiracy and Defendants' Membership in the Conspiracy*

Counsel for Arellano challenged the following Exhibits, arguing the Government did not establish that Arellano was a member of the conspiracy at the time the statement was taken: 9, 10-A, 10-B, 10-D, 10-F, 10-G, 10-H,[2] 10-I, 10-K, 10-M, 10-O, 10-P, 10-Q, 10-R, 10-S, 10-T, 10-U, 10-V, 10-W, 10-X, 10-Y, 10-Z, 10-AA, 10-AB, 10-AC, 12, 21, 22, 27, and 170. Arellano's principle contention was that there was a lack of proof by a preponderance of the evidence that he "was a member of the conspiracy at the time [each] statement was made."

According to the government's proffer, this dogfighting conspiracy lasted from December 2014 until June 2016, and, in addition to defendants, involved Monte Gaines, Frank Nichols, and other unnamed individuals. Gaines and Nichols have pled guilty to charges relating to this conspiracy. The government alleges a significant amount of planning and coordination took place in the course of the conspiracy.

---

[2] On the record, counsel for Arellano referred to this as "10-F." The Court infers, based on context, that he intended to reference 10-H.

The government contends it will establish through expert testimony that a part of the conspiracy involved selective breeding from fighting dog bloodlines using "Peds Online," a dog fighting website. Selectively breeding dogs "depends heavily on research and information sharing," which can be relayed "orally or in text communications." Government's Proffer, at 11. Additionally, selecting opponents for dogs is a complex process, involving weight, gender, and wagers, which often requires an interstate communication network. When planning to breed and fight dogs, defendants allegedly provided each other with updates regarding their dogs' "'bloodlines'; demonstrated familiarity with other fighting dog "bloodlines" and dog fighting practices; used coded language commonly used in the dog fighting industry; relayed one's own prior and current dog fights and dogs' fighting abilities; and divulged tips and techniques pertaining to dog fighting." Gov. Proffer, at 11-12.

The government contends that on December 16, 2014, Gaines and Love purchased two dogs from Arellano, a contention supported by text message communications, Ex. 9; airway bills, Ex. 3; handwritten notes about the shipment, Ex. 13; wire transfer records of payments, Ex. 2; a transmitted video allegedly of one of the dogs fighting another, Ex. 12, 21, 22; wiretap calls, Ex. 10-F, J, P; and handwritten pedigree information, Ex. 14, 237. Officers seized one of the dogs during a search of Gaines' residence.

The government also avers that Arellano shipped a dog to Ware by plane in November 2015, which is supported by a wiretap call, Ex. 10-M; "Peds Online"[3] pedigree printouts, Ex. 16; and photographs of dogs with notes in Arellano's handwriting, Ex. 19.

In October 2015, the Government claims Gaines and Ware conspired with individuals from in or near Chicago to fight a dog named Bubbles and that Gaines, Elliott, and Nichols conspired

---

[3] The Government contends this is an underground dog fighting website.

to store dogs at their respective residences. Gaines asked Ware to take Bubbles to hide the dog from law enforcement and Ware agreed. Gaines and Nichols transported Bubbles to Ware, and later the three discussed exhibiting Bubbles in a fight. The Government seeks to establish this based primarily on the intercepted communications. *See* Ex. 10-A, 10-D, 10-S, 10-T, 10-U, 10-AA, 23, 23A, 25.

Elliot maintained several dogs and fighting equipment at his residence, including Gaines' dogs. Nichols lived at Elliot's residence, and together they kept numerous dogs and dog fighting equipment. Gaines, Nichols, and Elliot had an agreement whereby one of Elliot's dogs – named Fancy – would live at Elliot's residence. Under the agreement, Nichols would be permitted to keep one or more puppies in exchange for helping to care for Fancy. Nichols also asked Gaines to set up fights for him and Elliot. Law enforcement seized Fancy during a search of Elliot's residence. The Government seeks to establish this through witness testimony; photographs of the dogs and Elliot's yard, Ex. 32-91; photographs of paraphernalia seized from Elliot's residence, Ex. 92-112; and intercepted communications, Ex. 10-K, 10-V, 10-W, 10-X, 10-Z.

The Government also proffers that defendants each possessed a stock of fighting dogs at their properties and identifies several pieces of evidence to support this claim: (1) expert testimony; (2) dog fighting equipment; (3) "do-it-yourself" veterinary medicine kits; (4) blood splatters on surfaces in Ware's residence; (4) an interview Arellano gave to a dog fighting magazine; (5) possession of dog fighting magazines and how-to books; (6) handwritten notes discussing dog fighting; (7) dog fighting pedigrees and registry documents; (8) wiretap phone calls and text messages.

Arellano's argument that the Government must show he was a member of the conspiracy at the time of the statement is misplaced. The party offering a statement of a coconspirator can

9

establish the statement's admissibility by proof of membership in that conspiracy at a time other than when the statement was made. *See United States v. Farhane*, 634 F.3d at 161 n.35. Capra, Principles of Evidence (2006), at 180-85. The Government has proffered sufficient proofs to demonstrate by a preponderance of the evidence that Arellano was a member of the conspiracy in that he sold a dog to Gaines and Love and sold another to Ware. That conspiracy, according to the Government's proffer, continued from December 2014 until June 2016. The statements that were made in furtherance of the conspiracy after Arellano sold the dogs remain admissible as statements in the continuing conspiracy alleged.

Further, the fact that individuals in some of the conversations, *see* Exhibit 10-O, 10-AB, 12, are unidentified does not mandate exclusion because the contents of the statements clearly indicates the unknown individual was a member of the conspiracy. *See United States v. McGlory*, 968 F.2d 309, 335 (3d Cir. 1992) ("What is essential is that the government show that the unknown declarant was more likely than not a co-conspirator."). Finally, the Court also notes that, contrary to arguments advanced by counsel for Love and Ware, the Government's proffer establishes those defendants' membership in the conspiracy as well. Police officers seized dogs from the property of each defendant and the evidence indicates both Ware and Love purchased dogs from Arellano. The Government's independent evidence in support of this, coupled with the contents of the wiretap communications – which make various references to dogs and dog fights – establishes by a preponderance of the evidence that a conspiracy existed and that defendants were a member thereof.

*"In furtherance of" prong*

Counsel for Arellano also identified several statements which he contended the government could not establish were made in furtherance of the conspiracy: Exhibits 10-B, 10-C, 10-E, 10-J,

10-L, 10-P, 10-Q, 10-AB, and 12. Counsel for Love averred that the statement in Exhibit 10-H was not in furtherance of the conspiracy. "The furtherance requirement is usually given a broad interpretation." *United States v. Figueroa*, 729 F.3d 267, 276 (3d Cir. 2013). Contrary to those arguments, the Court finds each of these statements were made in furtherance of the conspiracy:

- **10-B**: Arellano and Gaines discuss an incident where Arellano was administering Ivomectin[4] to a dog and nearly caused it to overdose. They then discuss the wins of some of their dogs. This statement constitutes a review of coconspirator exploits, *see United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985), and to contribute to the "information flow between conspirators intended to help each perform his role," *United States v. Kelly*, 261 F.R.D. 147, 152 (N.D. Ill. 2009).

- **10-C**: A conversation between Love and Gaines where Love states he hopes to get at least one champion out of his litter of dogs. In light of the evidence in the Government's proffer establishing that Love was raising dogs for Gaines, this statement is made directly in furtherance of the conspiracy. *See Kelly*, 261 F.R.D. at 151; *Ammar*, 714 F.2d at 252 (statements that inform coconspirators "of the current status of the conspiracy").

- **10-E**: A conversation between Love and Gaines in which they discuss how to raise dogs to be "killers." This conversation shows sharing of knowledge between the coconspirators and is thus in furtherance of the conspiracy. *See Kelly*, 261 F.R.D. at 151.

- **10-H**: A conversation between Gaines and Love in which Love informs Gaines about a class teaching how to "IV dogs," which appears to be about administering intravenous medication to dogs. This statement is part of the information flow between conspirators. *See id.*

- **10-J**: A conversation between Gaines and Ware about Gaines experience training a dog named "Pool Hall Bitch." This is admissible under *Kelly* and also to indicate the coconspirators' reliance on one another. *See United States v. Weaver*, 507 F.3d 178, 185 (3d Cir. 2007).

- **10-L**: A conversation between Gaines and Arellano in which Arellano states he is "going to send out . . . Dajwan's dog this morning"; he comments on the dog's strength; and recounts a story about a past dog fight. This conversation furthers the conspiracy in several respects. *See Ammar*, 714 F.2d at 252 (as a statement that maintains trust among the conspirators); *id.* (as a statement that informs coconspirators about the current status of the conspiracy); *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985) (as a statement that plans or reviews coconspirators exploits).

---

[4] An anti-parasite medication.

- **10-P**: A conversation between Gaines and Arellano in which Gaines reports on the abilities and training status of the dog "Pool Hall Bitch." *See Ammar*, 714 F.2d at 252 (statement about the current status of the conspiracy).

- **10-Q**: A conversation between Ware and Gaines in which Gaines asks for a "transporter" because "the animal people" visited his house and he needed to get the dogs off his property. This is admissible as an effort to avoid conviction, *see De Peri*, 778 F.2d at 981-82, and as an act of concealment, *see United States v. Pecora*, 798 F.2d 614, 630-31 (3d Cir. 1986).

- **10-AB**: A conversation between Gaines and an unidentified individual in which the unknown individual asks for information about "Pool Hall Bitch," including her "ped." This statement constitutes a plan of future coconspirator exploits. *Molt*, 772 F.2d at 369.

- **12**: A text-message conversation between Love and an unknown individual in which Love is seeking to sell a dog, which is in fact named in the indictment. Love also sends pictures and a video. This is direct evidence of Love acting in furtherance of the conspiracy.

The Court finds that each of these statements were made in furtherance of the conspiracy alleged in the indictment. The Court therefore finds each statement in the Government's proffer to be conditionally admissible at trial, subject to the protections for the defendants as explained in *United States v. Cheatham*, 500 F. Supp. 2d 528, 538 (W.D. Pa. 2007).[5]

Additionally, regarding the text-message communications that are the subject of the Government's motion to admit as intrinsic or alternatively under Rule 404(b) – Ex. 26, 170, 181, 191, 193, 196, 198, 201, 202, 203 – these messages are intrinsic because they constitute direct evidence of the charged conspiracy. The Court declines to exclude this evidence under Rule 403 as they are highly probative because of the direct references to dog fighting in the conversations.

### Internet Activity

The Government seeks to admit Exhibit 236, which is a report of Ware's phone's internet browsing history showing that he visited several websites with the title "Online Pedigrees" from

---

[5] The state's exhibits also include Exhibit 10-N, a brief transcript in which an unidentified female voice states "Hi, this is the Arellanos. Leave a message and we'll get back to you." The Government has not argued for its admissibility and the Court sees no grounds to admit same.

12

November 27, 2014, until May 30, 2016. The Government contends it will establish that these links are for "Peds Online," an underground dog fighting website. This web browsing history directly proves the charged conduct and is intrinsic to proving the crimes charged. The evidence shall not be excluded under Rule 403 because it is highly probative of Ware's access to websites related to dogfighting and is thus highly probative of the charged conduct.

### Exhibit 19 – Photographs

The Court reserved ruling on admissibility of Exhibit 19, which contains several photographs of dogs that are apparently not named in the indictment. The government proffered that the photographs were seized from Ware's residence. The Court finds these photographs are probative of Ware's knowledge, intent, preparation, plan, and involvement in the conspiracy. The photographs also include handwritten notations, which the government contends will show, with the assistance of expert testimony, the types of notations used to carry on a conspiracy such as this. Although these photographs are not of the dogs named in the indictment and are thus admissible as extrinsic evidence under Rule 404(b), the Court finds their probative value is not substantially outweighed by the risk of unfair prejudice. The Court shall entertain an objection – when and if appropriate – based on the over-cumulative nature of these photographs.

### Magazine Interview

The Government seeks to admit Exhibits 287 and 288, which are two articles published in underground dog fighting magazines containing interviews with Arellano. The articles are dated "January/February 2016" and "March/April 2016" respectively. Arellano discusses his dog fighting history and the bloodline of his dogs. Arellano objects to admission of this evidence arguing that it "has no relevance to the issue of whether Mr. Arellano transported the dogs in

question illegally," there is a risk of "unfair prejudice, misleading the jury and wasting time," ECF 166, and, it will paint him "as someone who has been involved in dog fighting in the past."

The Court finds the interview is relevant to the charges in the indictment because it shows his knowledge of breeding and – as the Government will seek to establish at trial – that the interview "refers to the outcome of particular dog fights in coded and euphemistic language." ECF 163, at 37. Arellano's interview-discussions of the crimes with which he is charged is are relevant to his knowledge of dog fighting and breeding, his participation in dog fighting communities, and his intent, motive and identity. The Court therefore finds this evidence admissible under Rule 404(b) and shall not exclude same under Rule 403.

*PETER G. SHERIDAN, U.S.D.J.*